```
 1                IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,     No. 4:20CR00160-SWW
 5

 6    v.

 7
      CLAYTON JACKSON,                 Wednesday, March 31, 2021
 8                                     Little Rock, Arkansas
                          Defendant.   10:30 a.m.
 9

10

11               TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
12                 UNITED STATES DISTRICT JUDGE

13
      APPEARANCES:
14
      On Behalf of the Plaintiff:
15
          MR. CHRIS GIVENS, Assistant United States Attorney
16            United States Attorney's Office
              Eastern District of Arkansas
17            Post Office Box 1229
              Little Rock, Arkansas 72203-1229
18

19    On Behalf of the Defendant:

20        MS. MOLLY K. SULLIVAN, Assistant Federal Defender
              Federal Public Defenders Office
21            1401 West Capitol Avenue
              Suite 490
22            Little Rock, Arkansas  72201

23    Defendant present

24        Proceedings reported by machine stenography and displayed
      in realtime; transcript prepared utilizing computer-aided
25    transcription.
```

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1                          I N D E X

2
GOVERNMENT WITNESS:      Direct    Cross
3
Aaron Hurst                5         14
4

5
EXHIBITS RECEIVED:
6
Government's 1......................................9
7  Government's 2.....................................11
Government's 3.....................................13
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2           THE COURT:  This is a hearing in United States versus

3    Clayton Jackson.  Mr. Jackson is here with his attorney, Ms.

4    Molly Sullivan.  And the United States is represented by Mr.

5    Chris Givens and Mr. Aaron Hurst.

6        Is that correct?  Let me look.

7           MR. GIVENS:  I'm sorry, Your Honor.  Yes.  This is FBI

8    Special Agent Aaron Hurst.

9           THE COURT:  I'm sorry.  I had his name.  And I

10   thought, no, that is one of the people who is in the fact

11   situation in the presentence report.  I was thinking momentarily

12   that -- you are representing the United States.  I realize that

13   -- but that you were an assistant U.S. attorney.  Thank you.

14       I would like for Mr. Jackson and his lawyer to come

15   forward.  You may stand at the lectern, and the clerk will swear

16   Mr. Jackson.

17       (Defendant sworn.)

18           THE COURT:  Mr. Jackson, are you under the influence

19   of any drugs or medicine or anything that would interfere with

20   your ability to understand this proceeding?

21           THE DEFENDANT:  No, ma'am.

22           THE COURT:  Ms. Sullivan, do you believe he's

23   competent to proceed?

24           MS. SULLIVAN:  I do, Your Honor.

25           THE COURT:  I find he's competent, and we will

1    proceed.

2        Ms. Sullivan, have you and Mr. Jackson reviewed the

3    presentence report?

4            MS. SULLIVAN:  We have, Your Honor.

5            THE COURT:  Do you have any objections to the report?

6            MS. SULLIVAN:  No, Your Honor.

7            THE COURT:  All right.  I have a couple of questions

8    for you, Mr. Givens.  First, do you have any objections to the

9    report?

10            MR. GIVENS:  No objections, Your Honor.

11            THE COURT:  Are you going to ask for a third point for

12    acceptance?

13            MR. GIVENS:  No, we are not, Your Honor.

14            THE COURT:  All right.  There being no objections to

15    the presentence report, the Court adopts it in its entirety.

16    The total offense level is 28.  The criminal history category is

17    VI.

18        Under the statute, for each count the maximum term of

19    imprisonment is 10 years.  And there are five counts.  Under the

20    guidelines, the range is 140 to 175 months.

21        And then, for supervised release, under the guidelines for

22    each count it would be one to three years, and I might add

23    supervised release is typically concurrent.

24        Probation is not available under the guidelines.  The fine

25    range is 25,000 to 250,000 dollars.  There's nothing in the

1    presence report about restitution.  I know for this offense
2    restitution is available for these offenses.  But what do you
3    have to say about that, Mr. Givens?
4              MR. GIVENS:  Although this was a victim-related
5    offense and restitution would be available in this case, there
6    is no request for restitution.
7              THE COURT:  And no evidence on the amount either, I
8    might add.
9              MR. GIVENS:  That's correct, Your Honor.
10             THE COURT:  All right.  The special assessment is $500
11   because there is a $100 mandatory special assessment for each
12   count of conviction.
13        And now I want to ask Mr. Givens if he has any evidence he
14   wants to present.  I'm talking about evidence, not a statement.
15             MR. GIVENS:  Yes, Your Honor.  We do have evidence to
16   present to the Court that Special Agent Hurst would testify to.
17             THE COURT:  That would be fine.  So I would like for
18   Ms. Sullivan and Mr. Jackson to return to counsel table.
19        And would you please come forward, Mr. Hurst.  And the
20   witness stand is right up here.
21             **AARON HURST, GOVERNMENT'S WITNESS, DULY SWORN**
22                         DIRECT EXAMINATION
23   BY MR. GIVENS:
24   Q.   Good afternoon.  I know that I've already introduced you to
25   the Court.  But just for the record, will you please state your

1    name and where you work.

2    A.    Yes.  Special Agent Aaron Hurst.  And I'm employed by the

3    Federal Bureau of Investigation.

4    Q.    Just for a little background and your involvement in this

5    case, have you interviewed the defendant, Mr. Clayton Jackson?

6    A.    Yes, I have.

7    Q.    And did you investigate the allegations that Mr. Jackson

8    has now admitted to that are contained in this PSR?

9    A.    I did.

10   Q.    I don't think -- both parties agree about the offense

11   conduct section that is in the presentence report, so I don't

12   think I need to talk to you about the investigation and the

13   threats that Mr. Jackson made.  I want to talk to you today

14   about some of the conduct that you are aware of since Mr.

15   Jackson has been indicted.

16   A.    Yes, sir.

17   Q.    Okay?  So are you familiar with additional letters and

18   threats that Mr. Jackson made after he was indicted in this

19   case?

20   A.    I am.

21   Q.    Let's turn -- and have you personally received some of the

22   letters that we're going to be talking about?

23   A.    Yes.  I believe the majority of them received -- I received

24   them from other law enforcement officials.

25              MR. GIVENS:  Your Honor, just for the record, I'm

1    going to be referring to a couple of different letters.  Those

2    letters I believe the agent will testify were actually written

3    by Mr. Jackson.  But I've also given copies of what I intend for

4    him to talk to to Ms. Sullivan.

5    BY MR. GIVENS:

6    Q.    I want to turn first to a letter that Mr. Jackson wrote

7    that was dated on June 26th of 2020.

8    A.    Okay.

9    Q.    Are you familiar with that?

10   A.    Yes, sir.

11   Q.    All right.  Just to be clear, do you know about when Mr.

12   Jackson was indicted for this case?  Was it June 4th of 2020?

13   A.    That sounds -- yes.

14   Q.    So this letter would have come after he was indicted?

15   A.    Yes, sir.

16   Q.    In a general sense, what did Mr. Jackson reference in this

17   letter?

18   A.    He referenced -- I can read some of the statements that he

19   said.  He was writing to an unknown individual and, in the

20   letter, which is signed by Mr. Jackson, states:  "I am going to

21   use the excuse that I was just pissed at the time when I

22   threatened FBI Special Agent Aaron Green.  But one thing is for

23   sure, he will be killed.  And that's how we'll make a name for

24   our organization."

25   Q.    What organization was he referring to?

1    A.    He refers later in the letter to a White Pride Mafia.

2    Q.    Did he indicate how he wanted to make a name for White

3    Pride Mafia?

4    A.    He states that "All of these people look and think I'm

5    blowing smoke.  But once we make our move, White Pride Mafia,"

6    which he also refers to as WPM, "will be a household name."  And

7    he later details a plan on how to do that.

8    Q.    All right.  And you referenced a name.  Did he actually

9    provide a list of names of people who he wanted to, as he said,

10   wipe out?

11   A.    Yes, he did.

12   Q.    And who are -- who did he list in this letter as people he

13   wanted to wipe out?

14   A.    There were four individuals.  And they were numbered as

15   follows.  Number one was U.S. Attorney Cody Hiland.  Number two

16   was FBI Special Agent Aaron Green.  Three was an individual by

17   the name of Michael Caldwell, and four was Cris Embry.

18   Q.    Based on your knowledge of this case, are you familiar with

19   the names Caldwell and Embry?

20   A.    I am.

21   Q.    Are they people that Mr. Jackson knows?

22   A.    Just associates of his, yes, sir.

23   Q.    And regarding the federal officers that he mentioned in

24   that list, did he have any other -- did he indicate that he had

25   any other information about those people?

1   A.   Yes.  He said that he had received all of the, quote,

2   private info from another individual of those listed persons.

3   Q.   Did he specifically indicate what he wanted to do or what

4   he wanted to have happen to those four people?

5   A.   He wanted them killed.

6   Q.   Okay.  Was there anything else that he discussed that would

7   raise the attention to law enforcement?

8   A.   Yes.  He had a postscript, a p.s., section of the letter

9   after his signature that read, "It will be easy for me to escape

10  from here.  Once I know" -- excuse me -- "once I work all

11  details out, I'll let you know.  One thing is for sure, they

12  can't stop us from carrying out our plans."

13           MR. GIVENS:  All right.  Your Honor, may I approach

14  the witness?

15           THE COURT:  You may.

16           MR. GIVENS:  Your Honor, if the Court would like a

17  copy, I would move to make this Government's Exhibit 1, the copy

18  of this letter.

19           MS. SULLIVAN:  No objection, Your Honor.

20           THE COURT:  It's received.

21       (Government's Exhibit 1 received in evidence.)

22  BY MR. GIVENS:

23  Q.   So you just testified that there was a postscript to the

24  January 26th letter in which he said that he was going to work

25  out details of an escape plan.  And at this point was he in

1    federal custody?

2    A.    Yes, he was.

3    Q.    All right.  Did you later receive another letter that was

4    written and signed by Clayton Jackson on January 11th of 2021

5    that gave more details about his escape plan?

6    A.    Yes.  It was dated January 11th of 2021.  Yes, it was

7    signed by him.

8    Q.    And did Mr. Jackson plead guilty to this offense on

9    November 2nd of 2020?

10   A.    Yes, sir.

11   Q.    All right.  So will you please tell the Court what Mr.

12   Jackson wrote in the January 11th, 2021, letter that details his

13   escape plans?

14   A.    He addresses the letter:  "Hey, bro."  And then he starts

15   the letter by saying:  "Check it out.  Here's what we are going

16   to do.  I'll get you an exact court date I go for sentencing,

17   look at security going into the fed courthouse in Little Rock.

18   From the garage is nothing but transport."  And then he

19   continues later, basically a plan to escape during his

20   sentencing hearing.

21   Q.    Okay.  Did he explain how he would try to get out of

22   handcuffs or any other restraints?

23   A.    Yes.  He states that he will have a makeshift handcuff key.

24   Q.    Okay.  Did he -- were there any diagrams or illustrations

25   that he had?  And, if so, will you describe them?

1    A.   I will.  There was.  And, yes, I will.  Basically he

2    describes an area that I know to be the back side of the U.S.

3    Courthouse, which is the intake for any prisoner transport.  It

4    shows the barricade and parking lots in the general area.

5             MR. GIVENS:  All right.  Your Honor, may I approach

6    again?

7             THE COURT:  You may.

8             MR. GIVENS:  I would again move to make this

9    Government's Exhibit 2.

10            MS. SULLIVAN:  No objection.

11            THE COURT:  It's received.

12       (Government's Exhibit 2 received in evidence.)

13   BY MR. GIVENS:

14   Q.   All right.  After that letter was written, did Mr. Jackson,

15   in fact, try to escape from custody?

16   A.   Yes.  He was an inmate being housed at the Prairie County

17   Sheriff's Department.

18   Q.   Will you please tell the Court what happened based on your

19   review of the reports from Prairie County on March 7th of this

20   year?

21   A.   The incident report states that Mr. Jackson had asked for

22   his blood pressure to be taken that evening because he felt ill.

23   Officers approached him to check his blood pressure.  And upon

24   unlocking the door, Mr. Jackson shoved the door open and tried

25   to take possession of the keys and stated he was going to escape

1    and that we, the officers, could not stop him.

2    Q.    All right.  And I realize he wasn't ultimately successful

3    since he's sitting here today.

4    A.    That's correct.

5    Q.    But what happened after he pushed open the door and stated

6    that he was going to get out?

7    A.    Just a moment.  Mr. Jackson tried shoving one of the

8    officers out of the way but failed to get around that officer.

9    He was sprayed with OC spray -- excuse me.  They pulled out OC

10   spray and kind of --

11   Q.    Threatened?

12   A.    -- to show force and did not have to spray him.

13   Q.    Okay.  Was he taken back into custody and put in

14   segregation at that point?

15   A.    Yes, sir, he was.

16   Q.    Okay.  Then, about four days after this escape attempt, so

17   on March 11th, are you familiar with one more letter that Mr.

18   Jackson wrote from the jail?

19   A.    Yes, I am.

20   Q.    Who is that letter addressed to on the envelope?

21   A.    It was addressed to the White Knights of the Ku Klux Klan

22   and Joseph McAllen or M. Callen, C-a-l-l-e-n.

23   Q.    And have you reviewed the contents of this letter?

24   A.    Yes, I have.

25   Q.    Again, just like the other two letters that you've

1  testified to that the Court has as Government's 1 and 2, was

2  this letter signed?

3  A.   Yes.  It was signed in signature and print Clayton Jackson.

4  Q.   And is that signature the same as all his other signatures

5  that you've seen throughout this case?

6  A.   It is.

7  Q.   What did Mr. Jackson write to the White Knights of the KKK?

8  A.   He wrote to them asking their assistance to finding two

9  people.  And he lists those as Michael Caldwell and his

10  girlfriend, Cris Embry.

11  Q.   Are those the same two people that he indicated he wanted

12  to have killed back in that January letter?

13  A.   Yes, it is.

14  Q.   Okay.  And did he specifically say that these are the ones,

15  you need to take care of them?

16  A.   Yes, he did.

17          MR. GIVENS:  Your Honor, I have that letter.  I move

18  to make that Government's 3.

19          THE COURT:  Any objections?

20          MS. SULLIVAN:  No objections.

21          THE COURT:  All right.  It's received.

22     (Government's Exhibit 3 received in evidence.)

23          MR. GIVENS:  Those are the questions I have for

24  Special Agent Hurst.

25          THE COURT:  Do you have questions?

1    MS. SULLIVAN:  May I have one moment, Your Honor?

2    THE COURT:  All right.

3                    CROSS-EXAMINATION

4  BY MS. SULLIVAN:

5  Q.   Agent Hurst, I'll be brief.  With regard to the first two

6  letters, Exhibit 1 and 2, how were those letters acquired?

7  A.   I believe -- I know the first letter was acquired -- let me

8  check my notes if you don't mind.

9       They were provided to me through the United States Marshals

10 Service is how I received them.

11 Q.   Exhibit 2 as well, the letter from January of 2021?

12 A.   Let me check.

13      Yes, ma'am.  That's correct.

14 Q.   And the third letter, of course, was mailed from Prairie

15 County Jail in Des Arc.

16 A.   The third was the incident report.

17 Q.   The fourth letter -- I'm sorry -- the third letter.

18 A.   Was intercepted by the jail and then routed to me.  I want

19 to say I also received that ultimately through the United States

20 Marshals Service.

21      MS. SULLIVAN:  Nothing further, Your Honor.

22      THE COURT:  Do you have any more questions?

23      MR. GIVENS:  No, Your Honor.

24      THE COURT:  Thank you, Agent Hurst.  You may stand

25 down.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Do you have any other evidence?

3          MR. GIVENS:  No, Your Honor.  That's all that I have.

4          THE COURT:  Ms. Sullivan, do you have any evidence?

5          MS. SULLIVAN:  No, Your Honor.  No evidence.

6          THE COURT:  All right.  I guess I'm supposed to have

7    an in camera hearing.  And this means that anyone who -- because

8    of COVID and security concerns, I'm going to have this in camera

9    hearing with everyone seated where you are.  And that means if

10   you are not an agent of the United States here for the purpose

11   of this case, you are to be excluded, but only briefly.  I have

12   to have this in camera hearing.  So if you all would step out

13   momentarily, I won't do anything other than this in camera

14   hearing without your presence.

15        [Sealed proceedings under separate cover.]

16          THE COURT:  All right.  Ms. Sullivan, I will let you

17   and your client, Mr. Jackson, if he wishes, I'll let you address

18   the Court now.  If you do so, just up here at the lectern.  I

19   can just understand you better and get a good look at you.

20        Mr. Jackson, you may accompany her if you would like.  Of

21   course, you have an absolute right to address the Court.

22          MS. SULLIVAN:  Your Honor, we are seeking a sentence

23   within the guideline range.  We do believe that is appropriate.

24   It takes into account the offense conduct as well as Mr.

25   Jackson's criminal history.  A sentence within that guideline

1    range would be appropriate.

2             THE COURT:  Mr. Jackson, do you have anything you

3    would like to say?

4             THE DEFENDANT:  No, ma'am.

5             THE COURT:  You understand you have a right to address

6    the Court?

7             THE DEFENDANT:  Yeah.

8             THE COURT:  You all may return to counsel table.

9        Mr. Givens, you may address the Court with respect to this

10   sentence.

11            MR. GIVENS:  Your Honor, this is a very interesting

12   case.  I'll start off by telling the Court I don't believe this

13   is a case that the guideline range is appropriate for.  I do

14   believe that every bit of this case -- that would include the

15   conduct before the indictment as well as the conduct after the

16   indictment -- indicates that a substantial term of imprisonment

17   is appropriate.  And I believe that number can be achieved by

18   running counts consecutively.

19       The maximum term for any of these one counts is 10 years.

20   I don't believe 10 years is sufficient.  And I believe the Court

21   could -- I'm not saying that 50 years is the appropriate term,

22   but I think you can go up to that level if you run them

23   consecutively.  I do believe that the guideline range, which is

24   up to I believe 175 months, is not sufficient.  I believe the

25   repeated and persistent threats to murder multiple people as

1    well as his complete lack of acceptance of his criminal activity

2    and any form of rehabilitation indicates I believe that 20

3    years' imprisonment at least would be appropriate.

4         Your Honor may believe that just based on the facts of this

5    case before we knew his conduct after he was indicted.  It's not

6    just that Mr. Jackson made repeated threats to kill federal

7    officers and Special Agent Green and Specialist Connor Hagan.

8    It's that after he was caught and then interviewed by Special

9    Agent Hurst, he not only admitted that, yes, I did send those

10   letters directly to those individuals stating that I was going

11   to kill them, but he reiterated and emphasized, I'm absolutely

12   serious.  And when I get out of here, I'm going to make good on

13   these threats.

14        He indicated to Special Agent Hurst that he knew that he

15   could not be locked up forever.  He stated that, Well, I know

16   that I got caught on this, but I can't stay in prison forever.

17   And when I get out, I will kill these people.  And it wasn't

18   just words, Your Honor.  He indicated he was familiar with

19   Special Agent Green's wife, the vehicles he drove.  He indicated

20   a plan about what he would do, that he knows where he works.  He

21   would stake it out, follow Agent Green home.  These are all

22   things that he said after he realized that we had those letters

23   and after Special Agent Hurst talked to him about that.  He was

24   absolutely serious, and he wanted people to know that he was

25   absolutely serious.

1    Then, after that happened, he continued and persisted and

2    reached out to people outside that were in the free world

3    stating, I want these people dead.  But he didn't at this point

4    limit his list to Special Agent Green and Specialist Hagan.  Now

5    he's expanding.  Now he wanted civilians Cris Embry and Michael

6    Caldwell killed.  He wanted former U.S. Attorney Cody Hiland

7    killed.  He stated again, just like he did with Special Agent

8    Green, that he had private information about these people and

9    therefore had means to do this.

10    He then pled guilty, Your Honor.  And he still, after

11    pleading guilty, he still stated he wanted people killed as

12    recently as two, three weeks ago.  This is not a person who is

13    going to come out reformed after 10 years in prison.  A review

14    of his criminal history shows that.  I've been discussing just

15    the facts of this particular case because they are egregious and

16    serious.  He's a Category VI criminal history.  He's been doing

17    this his whole life.  There is nothing that the Court can look

18    at or point to that says anything other than a lengthy prison

19    sentence is going to protect society from Clayton Jackson.

20    Frankly, Your Honor, based on his conduct in prison, I

21    don't even know that that can protect society because he's

22    mailing -- sending letters to people or attempting to asking the

23    people on the outside to have these people killed.  So, Your

24    Honor, there's a limit to what government and society can do to

25    people in this position.  We can't restrict his communication

1 with the outside world completely.  But what the Court has at

2 its disposal is restricting his freedom to do this on the

3 outside.  He's been a criminal his whole life.  He upped the

4 ante by trying to have people killed.  He repeatedly did that

5 after he was in custody.

6     So looking at the 3553(a) factors -- and I think, Your

7 Honor, the most important factor in this case is protecting

8 society.  I do believe that Mr. Jackson needs to be locked up

9 and kept away from people such as Agent Green, Specialist

10 Hagan, Cris Embry, Michael Caldwell, Cody Hiland, anybody else

11 that he is looking at.  He needs to be kept away from those

12 people for decades.  It's a serious sentence, a significant

13 sentence.  I realize that.  But this conduct absolutely warrants

14 it.

15             THE COURT:  Would you like to respond, Ms. Sullivan?

16             MS. SULLIVAN:  No, Your Honor.

17             THE COURT:  Would you like to respond, Mr. Jackson?

18             THE DEFENDANT:  No, ma'am.

19             THE COURT:  Ms. Sullivan, is there any reason the

20 Court shouldn't impose sentence now?

21             MS. SULLIVAN:  No, Your Honor.

22             THE COURT:  If you and Mr. Jackson would please come

23 forward.

24     In sentencing someone, I have to consider the sentencing

25 guidelines.  I also have to consider the other factors under 18

1    United States Code Section 3553(a).  Under that section, I have

2    to consider a lot of things, including the defendant's criminal

3    history and your personal characteristics.  And I must say that

4    not only have you threatened to kill people and ask other people

5    to kill people for you, that you would likely carry out those

6    threats if you were able to do it.  I base this on your criminal

7    history of violent acts.  You are, obviously, intent on doing

8    this.  You are showing no remorse.  You wrote your last letter

9    this month, March 7, 2021, to the KKK, the White Knights of the

10   KKK.  And that, of course, is an exhibit for this hearing.

11       I also have to consider the need to protect the public.

12   Needless to say, I do think that that is a big factor in

13   assessing the appropriate sentence for you.  I have to consider

14   the need to deter you and others from similar conduct in the

15   future.  I need to show a respect for the law, a sentence that

16   will show respect for the law and will reflect the seriousness

17   of this offense.  Those are the principal things I am

18   considering.

19       I'm also considering the need to avoid disparate sentences,

20   in other words, a sentence that would be fair, not just to you,

21   but to others in terms -- would appear to be fair in terms of

22   other people who have committed similar crimes.  In other words,

23   anyone who is charged with this under similar circumstances

24   would receive that same sentence.

25       And I must say that I agree with the United States that a

1  guideline sentence is not appropriate here.  175 months is not

2  enough.  You are still a young man.  You have a criminal history

3  that tells me that you are likely to re-offend, and you are

4  telling me that you are likely to re-offend.  And therefore I'm

5  going to sentence you to a longer term than I would ordinarily.

6  I don't know exactly how I will fashion this sentence.  It will

7  have to be some consecutive sentences.  But this is what I have

8  in mind.

9        I have in mind a sentence of 40 years.  And this is the way

10  I'll probably do it.  I will probably say Counts 1, 2, 3 and 4

11  will be consecutive one to another, 10 years each, which is the

12  maximum.  And then Count 5 will also be a 10-year sentence

13  consecutive to Counts 1, 2 -- I mean concurrent with Counts 1,

14  2, 3 and 4.  Now, if that does not work, we'll fashion it in a

15  different way on the judgment and commitment order.  But let's

16  talk about that for a minute before I go into the other aspects

17  of this sentence.

18        Mr. Hernandez is here from the probation office.  He is

19  technically the expert on these things.  Is there any reason the

20  Court can't do that, that is, consecutive sentences on Counts 1

21  through 4, then a concurrent sentence on 5, but all for 10

22  years?

23        PROBATION OFFICER:  That would be a correct sentence,

24  Your Honor.

25        THE COURT:  That's what I propose to do.  Now, while

1    you are incarcerated for this 480 months, I recommend that you

2    participate in substance abuse treatment, mental health

3    counseling and educational and vocational programs while you are

4    in prison.  Once you are released from prison, you will be on

5    supervised release for a term of three years per count to run

6    consecutively.  You are to report to the probation office in the

7    district to which you are released within 72 hours of your

8    release from the custody of the BOP, and you are to comply with

9    all mandatory and standard conditions.

10        Once you are released, you are to participate in a

11   substance abuse treatment program under the guidance of the

12   probation office.  The program may include drug and alcohol

13   testing, outpatient counseling and residential drug treatment.

14   You are not to use alcohol throughout the course of treatment.

15   You are to pay for the costs of treatment at the rate of $10 per

16   session with the total costs not to exceed $40 a month based on

17   your ability to pay as determined by the probation office.  If

18   you are unable to pay, the copayment will be waived.

19        You are to participate as well in mental health treatment

20   during your supervised release.  Again, this will be under the

21   guidance of the probation office.  You are to pay for the costs

22   of treatment at the rate of $10 a session with the total costs

23   not to exceed $40 a month based on your ability to pay as

24   determined by probation.  But the co-pay will be waived if you

25   cannot pay.

1        You must cooperate in the collection of DNA as directed by

2    probation.  You must pay $500 by way of special assessment.

3    That's non-waivable.  The Court will not impose a fine because

4    you are not likely to pay a fine, to be able to pay a fine.  You

5    are looking at a very long term of imprisonment.  And there are

6    no restitution requests or evidence on restitution, so I won't

7    order any restitution.

8        Now, I always ask if there's a particular place you want me

9    to recommend for incarceration.

10            MS. SULLIVAN:  Your Honor, Mr. Jackson is asking for a

11    recommendation close to New York state or Minnesota so he can be

12    close to family in that area.

13            THE COURT:  All right.  I will do that.  I will say

14    close to New York state or Minnesota so he can be close to

15    family.  Keep in mind that I am not able to designate a

16    facility.  You are not eligible to self-report.

17        This sentence, by the way, I will make consecutive to any

18    state sentence he is serving.  It's my understanding from the

19    presentence report -- I don't have his full file -- that he is

20    still serving a sentence -- is that correct -- from state court?

21            THE DEFENDANT:  Yes, ma'am.

22            MS. SULLIVAN:  Yes, Your Honor.  He's on a parole

23    violation.  He did not sign the IAD waiver, so his time on that

24    parole has been running while we've been handling this federal

25    case.  He will go back to the ADC at the conclusion of this.

1    THE COURT:  I don't know that this is the case.

2  Frequently in a situation like this, ADC -- I have no control

3  over it, but ADC releases the inmate to federal custody.  That's

4  not always true.

5    MR. GIVENS:  Your Honor, he's been in federal custody

6  the entire time.

7    THE COURT:  You got that on the record, that he has

8  been.  Don't they still have a detainer, a hold, on him?

9    MR. GIVENS:  Yes.  What would happen based on the

10  mechanics of his custodial status is that once his federal

11  sentence is completed, if the state sentence has not dismissed,

12  he would then -- no?

13    MS. SULLIVAN:  He'll go back to ADC and finish his

14  time, and then he will come back to federal custody and begin.

15    MR. GIVENS:  Ignore what I just said.

16    THE COURT:  I'm not sure that that's -- what I'm

17  trying to say is -- this is just anecdotal.  It's just

18  anecdotal.  Oftentimes when I've had someone in his situation

19  who has an incomplete state sentence, the state just hands them

20  over.  I don't know that that will happen.  But with a long

21  sentence like this, it would not surprise me, and I would have

22  no objection.  I don't have any grounds to object.  Anyway, it's

23  okay with me.

24    Now, is there any reason I should not -- is there anything

25  more with respect to the sentence I need to state for the

1  record?

2        PROBATION OFFICER:  Just to clarify, Your Honor, did

3  you want the term of supervised release to run consecutive or

4  concurrent?

5        THE COURT:  It would be, of course, concurrent.  I

6  tell you why I do that.  I just think that that's always

7  recommended.  If he violates, we can extend the term of

8  supervised release.  We can revoke supervised release.  I don't

9  think anything is served well by having consecutive terms of

10 supervised release.

11       PROBATION OFFICER:  Yes, ma'am.

12       MR. GIVENS:  I'm sorry.  I missed it earlier.  What

13 was the term of supervised release?

14       THE COURT:  Three.

15       MR. GIVENS:  Thank you.

16       THE COURT:  Three years.  Now, it's my duty to tell

17 you, Mr. Jackson, about your right to appeal.  You may appeal --

18 yes.

19       MR. GIVENS:  I apologize if I missed this too.  I just

20 want to be sure, Mr. Jackson.  There would be a $100 special

21 assessment with each --

22       THE COURT:  I imposed that.

23       MR. GIVENS:  You did say that?

24       THE COURT:  I did.  That's okay.  I said it.

25       MR. GIVENS:  I believe you.

1        THE COURT:  It's okay.  Now, it's my duty to tell you

2   about your right to appeal.  You may appeal your conviction if

3   you believe your guilty plea was unlawful or involuntary or if

4   there was some fundamental defect you didn't waive when you pled

5   guilty.  You may also appeal your sentence, which is way above

6   the guideline range.  You may appeal this if you believe it is

7   an abuse of judicial discretion.  With very few exceptions, you

8   have to file your notice of appeal within 14 days of judgment

9   being entered in your case.  You have the right to an attorney

10  and to have notice of appeal filed for you.  You will not have

11  to pay the costs of an appeal, nor will you have to pay for your

12  attorney.

13       And in light of the sentence I have just imposed, I want

14  Ms. Sullivan to assure the Court that she will, in fact, discuss

15  with him his right to appeal.  Will you do that?

16        MS. SULLIVAN:  I will, Your Honor.

17        THE COURT:  Do you need any time in private with him

18  for an attorney-client conference here in the courtroom with the

19  marshals present?

20        MS. SULLIVAN:  Yes, Your Honor.

21        THE COURT:  Do you all understand that, the marshals

22  who are here?

23        DEPUTY MARSHAL:  Yes, ma'am.

24        THE COURT:  We're going to give her -- at this time of

25  COVID, it is really sometimes hard to get people together with

1    their attorneys.  So I want to give him this opportunity.  It

2    will be a private conversation, but marshals will be here.  But

3    they are not going to share with anyone what happens.

4         All right.  Now is there anything more I need to state for

5    the record, Mr. Givens?

6              MR. GIVENS:  Nothing else from the United States, Your

7    Honor.

8              THE COURT:  What about from the defendant?

9              MS. SULLIVAN:  Your Honor, I do have one thing.  If

10   there are persons that Mr. Jackson requests to be separated from

11   during his Bureau of Prison sentence, does that information need

12   to be transmitted separately to the Court?

13             THE COURT:  I think the way we have done it in the

14   past is you give that information to the United States.  If you

15   want me to state in my recommendations, I can do that.  But I

16   tell you the bad thing about that, parts of that judgment and

17   commitment are accessible to the public.  So the more I say in

18   that judgment and commitment, the more likely it is that someone

19   who shouldn't see it is going to see it.  Are you understanding?

20             MS. SULLIVAN:  I understand.  I'll give the

21   information to the government.

22             THE COURT:  Maybe Mr. Hernandez can give you some

23   advice as to how to proceed on that.  But we definitely try to

24   protect inmates from one another.

25             MR. GIVENS:  Your Honor, we frequently do this.  We'll

have conversations with the United States Marshals offline.  It won't be a problem.

THE COURT:  Actually, the record reflects he has perpetrated, anyway, some event or events while he's been incarcerated as well.  You handle that.  If you have any trouble, let us know.

MS. SULLIVAN:  I will, Your Honor.  Thank you.

THE COURT:  Thank you very much.  Court is in recess. I ask that the marshals permit Ms. Sullivan and Mr. Jackson to confer with one another here in the marshals' presence.

DEPUTY MARSHAL:  Is it okay if they use the attorney conference room down in the cellblock?

THE COURT:  That will be fine.

DEPUTY MARSHAL:  We'll make sure he gets in one of those rooms.

THE COURT:  That will be fine.  I just want them to be able to talk about an appeal.

DEPUTY MARSHAL:  Yes.

THE COURT:  That will be great.  Thank you.  Court is in recess.

(Proceedings concluded at 11:12 a.m.)

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/Elaine Hinson, RMR, CRR, CCR      Date:  April 21, 2021.
United States Court Reporter